UNION MUTUAL LIFE INS. CO. *v.* MASTEN and others.

*(Circuit Court, D. Indiana.  ——, 1880.)*

1. AGENCY—IMPLIED AUTHORITY—EVIDENCE.—The implication ought to be clear where a party relies upon an implied authority from his principal to sell real property.

2. ADMISSIONS—EVIDENCE.—Admissions are not only competent, but may control the conclusion, where there is a conflict in the evidence, and they concern the subject-matter about which that conflict arises.

3. AGENCY—PRESUMED AUTHORITY—BONA FIDE PURCHASER.—When property has been purchased of an agent in good faith, and the money paid, under the supposition that the agent was duly authorized to make the sale, a court of equity will protect the purchaser, if it can do so consistently with principles of law.

*Claypool, Newcomb & Ketcham,* for plaintiff.
*Gordon, Lamb & Shepherd,* for defendants.

DRUMMOND, C. J.    It is difficult for the court to determine beyond all controversy what are the facts in this case, as faults have been committed on both sides.

The facts are that James Buchanan, a lawyer of Indianapolis, became the agent of the plaintiff, a corporation created under the laws of Maine, but doing business in Boston, Massachusetts, for the purpose of loaning money and taking security for these loans.    A large amount of business was transacted by him.    He says about $300,000 were loaned, for which security was taken.

Among the loans was the one which has given rise to the controversy in this case.    The arrangement made at the time Mr. Buchanan became the agent of the plaintiff, was, according to his own statement, that he was to receive his compensation out of the commissions the borrowers might be willing to give him for obtaining the loans; and, in case of foreclosure and legal proceedings, he was to have such compensation or fees as, by the terms of the contracts which he made with the borrowers, they were to pay.

A tract of land was sold under foreclosure proceedings, and a certificate of purchase was taken by Mr. Buchanan and transmitted to the company.    It seems that at the time the

sale took place there had been arrangements made between Mr. Buchanan and the Jackson Coal & Mining Company, by which the latter was to become ultimately the purchaser of the property. It was bid off and the certificate taken in the name of the plaintiff. At the time this arrangement was made between Mr. Buchanan and the coal company he claimed a considerable balance due him for fees. There had been a controversy previous to this, and on its being insisted by the plaintiff that the money which had been received by him should be paid over to the plaintiff, and that the matter of fees should be adjusted afterwards, Mr. Buchanan did pay over the sum of $1,700.

Now the fault, and I think it quit a serious one, committed by Mr. Buchanan was, that when he made the agreement with the coal company, and received the money which the company agreed to pay as the price of the land, he gave no information of the fact to his principal. He not only did not at that time say that he had made the sale, but he said nothing whatever about the receipt of the money, although he had received so large a sum as $8,000.

He says that he claimed the right to hold it for fees that were due him. Suppose that to be so, still, it was unquestionably his duty to give information at once to his client of the contract which he had made with the coal company, and of the receipt of the money. If that had been done I think there would have been no controversy such as the court is now called upon to determine.

It is also to be said, I think, that there was a fault committed by the plaintiff in not giving more specific instructions to Mr. Buchanan in relation to the property which might be, and was, taken for the debts which were due to the insurance company. If these instructions had been more specific, and if so much had not been left in doubt, this controversy would never have sprung up.

It is true, as a legal proposition, that while Mr. Buchanan, in foreclosing the mortgage, had the right to receive the money, if it had been paid, or if the land had been redeemed by Mr. Masten from the sale, still he had no right, without special instructions which amounted to authority, to dispose of the

certificate of purchase, which was taken in the name of the insurance company. Certainly he had no such right unless he was expressly, or by necessary implication, authorized to make the contract which he did with the coal company. He claimed that he had that right, and upon that is founded one of the exceptions to the report of the master. It would not be correct to say, under the proof in this case, that he had instructions authorizing him to sell the property or to dispose of the certificate of purchase. The implication ought to be clear where a party relies upon an implied authority from his principal to sell real property. I do not think that is the fact in this case. The certificate of purchase, having been transmitted to the insurance company, was returned by the company to its principal agent at Chicago, as it is claimed, for a deed, and by the agent at Chicago was sent to Mr. Buchanan here, as it is to be presumed, for the same purpose. When returned here, Mr. Buchanan indorsed the certificate over to the coal company, and when the controversy arose between the coal company and the insurance company, a bill was filed for the purpose of determining to whom the conveyance should be made by the officer who sold the property under the decree of foreclosure.

After all this had taken place, Mr. Sharpe, who, it seems not to be controverted, was a duly authorized agent of the insurance company, came to Indianapolis and had an interview with Mr. Buchanan, and, as Mr. Sharpe insists, he for the first time learned what had taken place viz.: that the property had been sold to the coal company; that the certificate of purchase had been indorsed by Mr. Buchanan to that company, and the full amount of the purchase money had been paid to him.

The case must turn on this point: whether or not, after Mr. Sharpe knew that Mr. Buchanan had received the money, he did anything which ratified the act of Mr. Buchanan in selling the property as the agent of the insurance company.

It may be said that the coal company did not act with as much prudence as a cautious man would have acted in the purchase of real property. For example: The arrangements were all made and the money paid before the certificate was

indorsed. When the last payment was made the certificate was assigned by Mr. Buchanan. No doubt seems to have been entertained by the coal company that Mr. Buchanan was duly authorized to transfer the certificate, and perhaps it was not unreasonable that this conclusion should be reached. Mr. Buchanan has insisted, certainly from the beginning of this litigation, that he had due authority.

Mr. Sharpe seems to be a very fair, well-meaning man, intending to do what was right and proper, and yet he was not quite as particular and clear as he ought to have been in dealing with a person like Mr. Buchanan. When first informed that Mr. Buchanan had the money, he did not inquire as precisely and definitely into all the circumstances of the case as he ought to have done. If, for instance,—on his theory of the case,—he had said to Mr. Buchanan, "You had no right to sell this property; what you did was an unauthorized act;" and he if had then refused to treat with Mr. Buchanan on the basis that he was authorized to receive the money arising from the sale of the property, there would have been no difficulty about the case. But he seems not to have taken any decided line of conduct, and adhered to it, from the first intimation given to him that the money had been received. It is true, he claims that while Mr. Buchanan had told him he had sold the property and got the money, Mr. Buchanan afterwards said the property had been redeemed, and that he did not understand distinctly that the certificate of purchase had been assigned. But it is clear, I think, from the interviews which took place between him and Mr. Buchanan, that the main object he had was to obtain the money. Of course, that was natural. It did not matter to the insurance company whether Mr. Buchanan had sold the land, or whether the decree of foreclosure had been paid or the property redeemed. They did not wish to make a speculation off the sale. All they wanted was the money, principal and interest, and it is to be observed that this is not without significance in determining what is the true view to be taken by the court.

It seems to me very clear that when the dispute sprung up between Mr. Sharpe and Mr. Buchanan, as to the amount

which was due to the latter from the insurance company, if
Mr. Buchanan had paid $6,000 to Mr. Sharpe, as agent for the
insurance company, there would have been no further contro-
versy.   Mr. Buchanan insists that he not only had the right
to dispose of this land, but that he had told Mr. Sharpe at
their first interview that he had disposed of it.   There seems
to be a little mystification in the use of language by Mr.
Sharpe.   While he says that Mr. Buchanan told him he had
sold the land, and that it had been redeemed, he says also
that Mr. Buchanan told him that it was a "three-cornered
trade."   Now, I think, if Mr. Sharpe had been particular
and searching in his inquiries he would have ascertained
more clearly than he seems to have done what the "three-
cornered trade" meant.

The question to be determined is this : Did Mr. Sharpe
know, at the time he demanded the money of Mr. Buchanan,
that Mr. Buchanan had sold the land and signed the certifi-
cate ; and did he, by demanding the money, or expressing a
willingness to take it from Mr. Buchanan, ratify the acts of
Mr. Buchanan?   I am inclined to think that the weight of
evidence is that he did.   I say this with some hesitation, but
I think, taking all the testimony together, that this is the
conclusion.

As I have said, Mr. Buchanan did not act quite fairly ; he
did not perform his whole duty to his clients ; he did not in-
form them of the facts.   The excuse he gives, that he did
not consider himself bound to inform the company that he
had sold the land and got the money until the whole thing
was closed up, is an invalid excuse.   Still, it seems to me,
taking all the evidence together, it is the duty of the court to
say that the weight of it is that Mr. Sharpe did know that
Mr. Buchanan had sold this land and had assigned the certi-
ficate, and that he did, with that knowledge, demand the
money of Mr. Buchanan.   Mr. Sharpe and Mr. Buchanan
are in conflict on this point.   I know that admissions are to
be taken with considerable allowance ; but admissions, where
there is a conflict in the evidence and where they concern the

subject-matter about which that conflict arises, are not only competent, but may control the conclusion.

Mr. Sharpe did admit to Mr. Johnson, as I understand the latter's testimony, that he had asked for the money after he had known of the sale and the assignment of the certificate. Mr. Johnson was one of the officers of the coal company at that time. The money had already been paid, and of course he was very much interested in knowing the actual state of affairs, and the substance of his testimony is that he asked Mr. Sharpe whether Mr. Buchanan had told him the property had been sold, and the certificate signed and transferred. He was very closely cross-examined by counsel on the other side, but his testimony, I think, is unshaken on that point. Assuming Mr. Sharpe understood what was said to him, then I think there was an admission on his part. He says in one part of his examination he did demand the money, and offered to take $6,000 and credit Mr. Buchanan with the balance. When he was interrogated by counsel as to whether he might have said that Buchanan had told him about the sale and the assignment of the certificate, his answer was: "I may have so stated."

In conclusion, I may say, this property, having been purchased by the coal company, the money paid, and the whole transaction on its part having been in good faith, that it is the natural inclination of a court of equity, if it can do so consistently with principles of law, to protect a party under such circumstances. I agree that the insurance company is not to lose, provided its equities are clear and distinct, notwithstanding the coal company may have paid its money; but it is to be recollected that Mr. Buchanan was the agent of the company. It had held him out to the world as such, and under the circumstances it is not surprising that the coal company should suppose Mr. Buchanan had the right to do what he did, having transacted the business, such as loaning money, collecting debts, and foreclosing mortgages.

Therefore, in a doubtful case like this,—doubtful in some aspects of it,—I think, if there is to be a loss here, that it is

more equitable that this plaintiff should lose than the coal company.

A decree may therefore be entered in conformity with the view which the court takes of the controversy, the result of which will be that the property sold will be transferred to the coal company, and the insurance company and Mr. Buchanan must decide their controversy in another litigation, which, according to the evidence, is now pending in another forum.